**Vore v Seaport Global Holdings LLC**

2024 NY Slip Op 31345(U)

April 17, 2024

Supreme Court, New York County

Docket Number: Index No. 152094/2020

Judge: Joel M. Cohen

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK NEW
YORK COUNTY

PRESENT:  **HON. JOEL M. COHEN**          PART          03M

*Justice*

-----------------------------------------------------------------------X

ADAM VORE

**INDEX NO.**     152094/2020

Plaintiff,

- v -

SEAPORT GLOBAL HOLDINGS LLC,

Defendant.

-----------------------------------------------------------------------X

## DECISION AFTER NON-JURY TRIAL

After a six-day non-jury trial, the Court concludes that Defendant Seaport Global

Holdings LLC ("Seaport") is liable to Plaintiff Adam Vore ("Vore") for $3,951,603 under the

parties' July 26, 2017 Offer Letter ("Offer Letter"), less $616,401.68 for the unpaid Vore

Expenses due from Vore to Seaport under the parties' November 20, 2018 Compensation

Agreement ("Compensation Agreement").

All other claims by the parties are denied.

## FINDINGS OF FACT

In the summer of 2017, Vore left his job as an investment banker at Stifel, Nicolaus &

Company ("Stifel") to join Seaport in a similar role.  Vore planned to bring with him to Seaport a

proposed transaction involving a Canadian company, UrtheCast Corp. ("UrtheCast"), that would

close quickly and pay a substantial fee (NYSCEF 351-ConwillTr-32:21-25).

## I. The Offer Letter and Stifel Dispute

Under the July 26, 2017 Offer Letter, Seaport agreed to pay Vore "an annual salary of $250,000" plus additional compensation "based on [Seaport's] standard annual 'payout' schedule for investment bankers." (JX005-001). Envisioning the Urthecast transaction, the Offer Letter further provided that

> You shall be paid 80% of the net fees paid to the Firm, but in no event to exceed an aggregate total payment to you of $4,000,000, for any transaction sourced by you and placed by you on behalf of an issuer who does not have any other current or historical relationship with the Firm, so long as such transaction is placed on or prior to December 31, 2017 – this additional payout will be reduced by the amount of salary you will have received from your start date through December 31, 2017

(JX005-002).

Pursuant to his prior employment agreement with Stifel, Vore had agreed that he would not use or disclose any confidential information about Stifel clients or prospective clients, and that he would observe a 90-day "garden leave" period following notice of his voluntary resignation, which was July 25, 2017 (JX011). In August 2017, Seaport sought to negotiate a resolution with Stifel to waive the garden leave and to resolve a brewing dispute between Vore and Stifel (JX007, JX008, JX009). On September 26, 2017, Stifel's counsel wrote to Vore's counsel alleging that Vore "improperly forwarded to his personal email account … a term sheet of a potential transaction he had been working on with [UrtheCast]." (JX013-002). In October 2017, Stifel commenced arbitration against Vore (NYSCEF 344 [Joint Statement of Facts ("SF")] ¶21, 31; JX047-012-018 [Statement of Claim, dated October 18, 2017]).

## II. The UrtheCast Engagement

In the meantime, on October 13, 2017, UrtheCast engaged Seaport "as its exclusive placement agent, underwriter and investment banker in connection with the proposed offer and

[* 2]

sale … of [UrtheCast's] debt instruments … and/or a private placement of [UrtheCast's] equity securities." (JX014-002, the "Engagement Letter").  The following week, on October 23, 2017, Vore commenced his employment with Seaport (NYSCEF 352-VoreTr-30:12-13).

Vore and UrtheCast had lenders lined up for an UrtheCast financing before Vore resigned from Stifel (JX013; NYSCEF 352-VoreTr-30:11-12).  However, Seaport's head of debt capital markets Jack Mascone wanted his "sales force to have a crack at" finding a lender for UrtheCast (NYSCEF 352-VoreTr-30:12-17).  Meyer and Mascone testified that Vore's proposed lender "fell away" and Seaport's salesforce worked to identify a new and more attractive funding source (NYSCEF 353-MeyerTr-281:19-282:18, 295:8-20, 309:14-310:4, NYSCEF 355-MasconeTr-422:16-423:7, 424:24-426:20, 519:12-18, 520:7-17, 526:10-527:1-3), and that they "construct[ed] the equivalent of a [] comprehensive marketing approach to approach the market with respect to [UrtheCast's] capital needs" (NYSCEF 355-MasconeTr-422:12-15).

On October 5, 2017, Mascone sent a calendar invite, "Salesforce teach in on Earth-imaging Geospatial analysis business", attaching, "Teach-In Pres 10.4.2017 v1 INTERNAL USE ONLY.pdf" (DX-008).  At trial, Meyer identified Seaport salesperson Michael Glickman as the individual who covered and contacted Sound Point Capital Management, L.P. ("Sound Point"), the eventual lender in the transaction as consummated, about UrtheCast (NYSCEF 353-MeyerTr-300:23-301:3).  Glickman did not testify at trial.

Within a week of Vore's October 23, 2017 start date, Mascone made an introduction to Sound Point (NYSCEF 352-VoreTr-30:12-17; JX017).  On December 15, 2017, UrtheCast and Sound Point executed a term sheet—addressed to Vore and Mascone—for a "senior secured term loan commitment" (the "Term Sheet") (JX021-014).  The Term Sheet was "subject to due diligence" and UrtheCast paid Sound Point a $250,000 working fee (JX021-014).  On December

27, 2017, UrtheCast and Seaport entered into a Letter Agreement, wherein UrtheCast agreed to pay Seaport an advisory fee of $5,000,000, which was "fully earned as of the date of the Letter Agreement, and shall be non-refundable." (JX027).

On December 29, 2017, Seaport's CFO Mary Johnson explained to Seaport's in-house counsel Gary Meringer that for Seaport to recognize the $5,000,000 UrtheCast advisory fee as income for 2017, the agreement "MUST be signed and dated in 2017." (JX024).

On December 29, 2017, UrtheCast announced it had "entered into an exclusivity agreement on December 15, 2017" with an "institutional investor" (*i.e.*, Sound Point) and was "working closely with the investor to finalize closing documentation" subject to subject to final definitive documentation being completed and agreed, due diligence, and board approval (JX025).

On January 2, 2018, Seaport's Co-CEO Daniel Conwill (to whom Vore reported) sought to recognize the UrtheCast advisory fee as 2017 revenue, writing to Johnson: "Book Urthecast in December as follows: …." (JX028). In response, Johnson provided Conwill with a January 3, 2018 spreadsheet of the "UrtheCast—Total Placement Fees," which Conwill sent to Seaport's Head of Global Sales and Trading Michael Meyer (JX029). Meyer asked Conwill to "send [him] the letter that confirms [UrtheCast] is bound to make this payment." (JX031).

On January 3, 2018, Conwill replied stating, "I sent it along with original E[ngagement] L[etter] and Vore contract" (JX031), and separately forwarded three documents to Meyer: (i) Vore's Offer Letter (JX032-024); (ii) the Engagement Letter (JX032-002) (with draft Term Sheet attached (JX32-013)); and (iii) the Letter Agreement (JX032-023). On January 4, 2018, Meyer forwarded those documents to Seaport partner Michael Meagher (Co-CEO) and Kurylak. Shortly after, Meagher forwarded the documents to another Seaport partner, Steven Smith (JX033).

At trial, Meyers and Kurylak testified that the internal Seaport discussion related to the Seaport's desire to recognize revenue for 2017, not to Vore's compensation (JX034; NYSCEF 353-MeyerTr-287:9-289:11; NYSCEF 354-KurylakTr 291:21-292:15, 341:9-12, 342:10-12, 343:21-344:8). However, Meyer and Kurylak could not otherwise explain why Vore's Offer Letter was included as part of these emails (NYSCEF 353-MeyerTr-289:17-290:11; NYSCEF 354-KurylakTr-340:23-25). The Court finds, based on the totality of the evidence, that potential payments to Vore arising out of the Urthecast transaction were and remained very much in the minds of senior Seaport officers throughout this period.

UrtheCast announced on January 31, 2018, that "definitive documentation [for the transaction] will not be completed by the targeted date of January 31, 2018." (JX039). The delay related to due diligence and "effectively having to restructure the facility that [SoundPoint was] intending to provide" (NYSCEF 355-MasconeTr-535:6-18).

In April 2018, Seaport and UrtheCast amended their engagement letter. Instead of a $5 million cash fee, UrtheCast agreed to pay Seaport $3 million in cash and $3 million in Unsecured Convertible Debentures and Warrants for UrtheCast's Common Shares (the "UrtheCast Shares"), for a combined fee of $6 million (JX045).

UrtheCast and Sound Point finalized a Credit Agreement as of May 18, 2018 (JX211) and its essential terms matched the Term Sheet (NYSCEF 355-MasconeTr-548:18-25; JX21). UrtheCast paid Seaport the $3 million cash fee and transferred the UrtheCast Shares to Seaport (NYSCEF 344-SF ¶¶28-29; JX064; JX065).

### III.    The Stifel Arbitration

In mid-April 2018 Stifel served Seaport with a subpoena in Stifel's arbitration proceeding with Vore (JX048; NYSCEF 344-SF¶ 33; NYSCEF 353-VoreTr-65:1-6). Around that time,

Vore provided Seaport the arbitration pleadings (JX047-001, JX050-001, NYSCEF 353-VoreTr-65:1-6).

In September 2018, Stifel sought to add Seaport to the arbitration. The arbitration panel denied that request, and, in mid-October 2018, Stifel commenced a separate arbitration against Seaport (NYSCEF 353-VoreTr-85:17-21; NYSCEF 344-SF ¶¶34-35; JX103, JX112).

## IV.    The Compensation Agreement

Meanwhile, in June 2018, Vore inquired of Conwill as to the "timing of payouts [to Vore] for" the Urthecast transaction (JX073). Although Seaport denied owing Vore anything under the Offer Letter with respect to the Urthecast transaction because the transaction was not completed in 2017, in late June the parties began negotiating a resolution (NYSCEF 353-MeyerTr-297:1-4). By this time, Vore was the Chairman of UrtheCast's Board of Directors (NYSCEF 344-SF¶30), and Vore elected to receive as compensation "substantially all" the securities Seaport had received as its fee rather than cash (JX091, JX106; NYSCEF 353-VoreTr-191:16-193:16; 200:4-15). In August 2018, Seaport and Vore agreed that to resolve the dispute regarding Vore's compensation for the UrtheCast Transaction commission, Seaport would transfer the UrtheCast Shares to Vore (JX094; JX098).

On October 16, 2018, Vore received a draft of what became the Compensation Agreement (JX108). The parties negotiated the terms of this new agreement, and on November 20, 2018, the parties executed the Compensation Agreement (JX128). The Compensation Agreement, Section 1, titled "Payment to Vore" provided:

> (a) As compensation for his work on the UrtheCast Transaction, and in consideration of Vore's indefeasible payment in full, as more particularly described in subsection (d) below, of Vore's Expenses (as defined herein), Seaport shall transfer (i) 11,384,615 common shares of Urthecast, and (ii) 5,692,307 warrants to purchase common shares of Urthecast ((i) and (ii) collectively, the "UrtheCast Compensation

[* 6]

Shares") to Vore in accordance with the restrictive terms and conditions set forth herein to occur not before January 1, 2019.

(b) As used herein, the term "Vore's Expenses" shall mean the sum of (x) the aggregate amount of draw payments advanced by Seaport to Vore from Vore's first day of employment with Seaport *plus* (y) Vore's pro rata share (i.e., 47.45%) of the Stifel Resolution Costs.

(c) As used herein, the term "Stifel Resolution Costs" shall mean any and all expenses incurred by Seaport in connection with the resolution of the Stifel/Seaport Matter and the Stifel Arbitration Claim, in the aggregate, including but not limited to Seaport's settlement payment to Stifel and any related legal fees incurred.

(d) As soon as practicable following the final resolution (the "Stifel Resolution") of both (i) the Stifel/Seaport Matter and (ii) the Stifel Arbitration Claim, but in no event later than sixty (60) days following the Stifel Resolution, Vore shall remit the Vore Expenses to Seaport in immediately available funds. Shares may be sold by Vore and proceeds will be deposited with Seaport to cover these costs.

(JX128). Notably, the last sentence of paragraph 1(d), providing that Vore may liquidate Urthecast shares to cover the Vore Expenses, was a change specifically requested by Vore and accepted by Seaport (NYSCEF 352-VoreTr-90:20-25; 20:1-7).

Section 2 of the Compensation Agreement, titled "Transfer of the UrtheCast Compensation Shares" provided:

Upon execution of this Agreement, the Parties shall:

(a) begin the transfer process in connection with the reregistration of the UrtheCast Compensation Shares into Vore's name; and

(b) begin the good faith negotiation of a pledge agreement (the "Pledge Agreement") whereby the UrtheCast Compensation Shares shall be pledged and hypothecated to Seaport, and Vore shall be prohibited from the transfer, assignment, pledge or other disposition of the UrtheCast Compensation Shares in any way, whether contractually or otherwise, without Seaport's prior written consent. For the avoidance of doubt, the execution of the Pledge Agreement shall be a condition precedent to the reregistration of the UrtheCast Compensation Shares into Vore's name.

(JX128). The Compensation Agreement went on to provide in Section 5, titled "Satisfaction and Discharge of Seaport's Obligations to Vore in Connection with the UrtheCast Transaction," that:

Upon the transfer of the UrtheCast Compensation Shares to Vore:

(a) all obligations of Seaport to Vore related to the UrtheCast Transaction (other than those obligations created hereunder) will be fully satisfied and discharged and Seaport shall have no further obligation to Vore in connection therewith, notwithstanding anything set forth to the contrary in that certain offer letter dated as of July 19, 2017 (the "Offer Letter") by and between Vore and Seaport; and

(b) Vore releases and discharges Seaport and its affiliates and their respective directors, partners, managers, officers, employees, agents, and advisors and each of their respective successors or assigns from any and all claims or counterclaims that Vore ever had, now has, or may have, in any way arising under, or related to, the Offer Letter."

(*id.*).

## V. The Parties' Attempts to Comply with the Compensation Agreement

On October 30, 2018, Mascone and Kurylak emailed about when Seaport would transfer the UrtheCast Debentures to Vore. Mascone asked Kurylak whether, to address Vore's "tax concern" (that is, Vore's stated preference to receive compensation in 2019 rather than 2018), Seaport could "expense this comp package for 2018" but make the transfer in 2019. Kurylak answered that "it could work on [Seaport's] end if we transfer the shares to [Vore] on January 1 or close to that date." (JX116). Section 1(a) of the Compensation Agreement —providing that Vore was to receive the "UrtheCast Compensation Shares" "not before January 1, 2019"—was related to Vore's request not to receive (and therefore recognize) the income in 2018.

Ten days later, on November 30, 2018, the Stifel/Seaport/Vore settlement agreements were completed (JX132). In December 2018, Seaport paid Stifel $600,000 pursuant to the Settlement Agreement (NYSCEF 344-SF¶37). Seaport also paid $70,548.54 in legal fees and

expenses to the firm of Manatt, Phelps and Phillips LLP in connection with the Stifel arbitration matters (NYSCEF 344-SF¶38).

In January 2019, Seaport and Vore discussed liquidating some of the UrtheCast stock to cover the Vore Expenses. On January 4, 2019, Silverman emailed Vore: "under §1(d) of the Compensation Agreement, you owe $616,401.68 in all. Please let us know if you wish to write a check to the firm for all or some of that amount and/or whether you prefer that we liquidate some UrtheCast stock to cover some/all." (JX136). Responding to Vore's email that "[Vore] thought [he] would have 60 days from taking the stock this year to fulfill the need," on January 7th, Silverman wrote: "The firm wishes to stick with the terms of the agreement (which, per Section 1(d) yields the timeline I alluded to in my email below). Therefore if you prefer not to write a check, the default becomes Seaport's liquidation of some stock on or about 1/29 to cover the obligation." (JX138).

On January 22, 2019, Mascone wrote to Seaport's Head of Compliance Markus Witthaut: "we are initiating the process to sell shares into the market to satisfy Adam's obligation for his draw and portion of Stifel settlement/legal expenses." (JX140). However, Seaport realized that there was a potential legal problem with selling or transferring the Urthecast Shares to Vore, and that a restrictive legend would appear on the Urthecast Shares. A restrictive legend puts the world on notice that the securities in question are restricted and can only be sold in certain circumstances (Dkt-357-BurninghamTr-727:16-20). The UrtheCast Shares were restricted because they were not registered with the U.S. Securities and Exchange Commission (SEC) (Dkt-357-BurninghamTr-729:19-20). On the same day, Seaport's Operations Manager David Small emailed Mascone (copying Kurylak): "See attached, section 9.14 Legends on Common Shares. This is the legend that will appear on the certificate. Looks like the cert can be sold in a

Reg S or 144A transaction but the last sentence says 'Delivery of this certificate may not constitute 'good delivery' in settlement of transactions on stock exchanges in Canada'." (JX141).

Seaport investigated whether it would be possible to remove the restrictive legend and was advised by outside counsel that "the documents required for a US legend removal will be dependent on what US exemption is being used to remove the legend." (JX153).   On January 28th in the late evening, Silverman forwarded his January 4, 2019 Vore email to Kurylak and Mascone and wrote: "We should speak again about where we think we stand. That will shape what I tell him." (JX150).  Early the next morning, on January 29, Mascone requested and received a copy of Vore's Offer Letter (JX152).

On or around January 30, 2019, despite the fact that Vore had not yet paid the Vore Expenses (which Seaport asserts were due by January 29, 2019), Seaport began working on the Pledge Agreement required under the Compensation Agreement to facilitate the transfer of the Urthecast Shares to Vore (NYSCEF 355-SilvermanTr-573:17-574:1).  During that time Seaport continued to inquire as to how to remove the restrictive legend from the shares or what exemption could be relied upon to transfer the shares to Vore.  On February 1, UrtheCast's Canadian counsel wrote Chu and Small: "We have spoken to the company's US counsel and transfer agent. The US legend will need to stay on the shares as long as Seaport continues to retain beneficial ownership." (JX154).

On February 4, Small wrote to Chu and UrtheCast counsel: "We may be transferring the shares into another name shortly," meaning Vore (JX156-002).  On February 20, Chu wrote to Mascone: "the shares have a US legend as we did not file a US prospectus for the shares so there is a trading restriction. If you were Canadian, it would be freely tradeable. However, you may

obtain an exemption & the shares may be freely tradeable for a certain period of time but you shouldn't obtain the exemption until you are ready to sell." (JX166).

On February 25, Small wrote to UrtheCast's transfer agent that: "Seaport Global recently converted some of our debentures into shares and received a share certificate with a legend on it. I was wondering what we would need to provide if we were to transfer the shares to an officer of the company? I'm assuming that it would be the normal transfer form along with a stock power and corporate resolution. However, since the transfer may be to an officer of the company I don't know if there would be anything further needed. Also, if we were to transfer and they wished to sell, what would they need to lift the restriction. Can they rely on Rule 904 in order to lift the restriction or would they have to rely on another exemption. I noticed that one of the representations in the docs for shares offer in reliance of Reg S states that the shareholder is not an officer or director of the company. Would there be a different exemption that an officer could rely on to lift the restriction?" (JX169-002).

Vore signed the Pledge Agreement on February 26, 2019, giving Seaport the right to sell, at any price, sufficient Shares to cover the Vore Expenses (JX170-005-§10(a)(iii)). The contract contemplates "reregistration of the UrtheCast Compensation Shares into Vore's name" (JX128 §2(a)).

On March 6, Small wrote to Mike Klose, UrtheCast's General Counsel: "Our discussion was very helpful. At that time I was not sure if we were going to leave the shares in Seaport's name or transfer them to Adam Vore. We will be transferring them into Adam's name. … Since it looks like Adam could not use this [Rule 904] exemption, I wanted the transfer agent to advise if there was another exemption that he could use to remove the legend." (JX173-003).

On March 8, Klose wrote to Small: "The advice we've received is that it is not recommended to remove the legend in a blanket fashion as is currently proposed (ie, with no intention, or even ability to immediately trade the shares)." (JX173-001). On March 12, UrtheCast's Canadian counsel wrote to Chu: "Anyone with a very basic understanding of US securities laws would understand that [UrtheCast] is not a registrant in the US and, even though its shares are freely tradeable in Canada, they require a legend under applicable U.S. laws." (JX174-002). On April 5, Small wrote to Johnson: "There is a 1 year restricted period under Rule 144. That would end on May 5th 2019." (JX178).

## VI.    Vore's Termination

On April 30, 2019, Seaport terminated Vore's employment, and provided him a draft separation agreement (JX181). The proposed separation agreement offered to transfer a portion of the UrtheCast Securities to Vore subject to his payment or a netting calculation of the Vore Expenses (JX181-009-§6(a)). Vore rejected the separation agreement (NYSCEF 352-VoreTr-121:14-20).

In early September 2019, Vore contacted Seaport seeking release of the UrtheCast Shares and threatened a $12 million legal claim (JX184; NYSCEF 352-VoreTr-122:21-123:13).

On September 18, 2019, Seaport demanded payment of the Vore Expenses, writing: "If Mr. Vore fails to make that payment on or before September 27, 2019, Seaport will sell shares of common stock of UrtheCast Corp. or warrants to purchase common stock in the amount of $616,401.68, and thereafter transfer the remainder of the shares and warrants to Mr. Vore." (JX186-010; NYSCEF 356-SmallsTr-650:1-21). (In view of Seaport's argument in this case that Vore's failure to pay the Vore Expenses in January 2019 forfeited his rights under the Compensation Agreement, *see infra*, it is notable that in this correspondence, nine months after

the purported breach, Seaport was *still* seeking to comply with the terms of the Compensation Agreement.) Vore responded that he did not owe Seaport any payment due to Seaport's breach of the Compensation Agreement, and asserted that Seaport could not engage in "self-help" (JX187).

On November 8, 2019, Seaport offered, "without a release or settlement agreement" to transfer Vore the Urthecast securities, minus the number of securities valued at the amount Vore owed. Seaport asked Vore to "confirm [he] wants Seaport to take these steps." Vore did not confirm (JX193; NYSCEF 356-SmallsTr-651:1-652:6).

During this time, Seaport communicated with UrtheCast and TSX Trust Company ("TSX") in November 2019 about transferring the Shares to Vore, including preparation of a required opinion letter by Seaport counsel, in a form satisfactory to UrtheCast and TSX, that the transfer was permitted under U.S. securities law (JX188; JX194; JX196; JX197; JX199; JX201; JX202; JX206).

In early 2020, Seaport continued to seek an opinion letter to facilitate the transfer of the Urthecast Shares to Vore (JX208). However, at this point, the market value of the UrtheCast Shares was "substantially down, materially" (NYSCEF 352 VoreTr-140:3-12, 141:6-21). Eventually, UrtheCast filed for bankruptcy in September 2020 (NYSCEF 344-SF¶48), with Seaport still holding the Urthecast Shares (NYSCEF 356 SmallsTr-668:3-11).

## PROCEDURAL BACKGROUND

Plaintiff commenced this instant action on February 26, 2020, bringing several claims against Seaport including breach of the Employment Agreement, violation of New York Labor Law Article 6, unjust enrichment, quantum meruit, and promissory estoppel (NYSCEF 1 and 2). On January 15, 2021, this Court held oral argument on Defendant's motion to dismiss (Mot. Seq.

[* 13]

INDEX NO. 152094/2020

RECEIVED NYSCEF: 04/17/2024

001), Plaintiff's motion for partial summary judgment (Mot. Seq. 002), and Plaintiff's motion to compel discovery from Defendant (Mot. Seq. 003).   By Order and Decision dated January 15, 2021 (NYSCEF 60 and 61), this Court denied both Defendant's motion to dismiss and Plaintiff's motion for partial summary judgment as "neither side has shown that their reading is the only credible reading of this agreement" (NYSCEF 63 at 29 [Transcript of Proceedings]).

On February 26, 2021, Defendant filed its Answer with Counterclaims (NYSCEF 66). Thereafter, Plaintiff filed an Amended Complaint on March 4, 2021, adding a cause of action for breach of the Compensation Agreement (NYSCEF 67).  Defendant filed an Amended Answer with Counterclaims on March 24, 2021 (NYSCEF 70), and Vore filed an answer to Defendant's Counterclaims on April 2, 2021 (NYSCEF 72).  Pursuant to a So-Ordered stipulation (NYSCEF 140), the parties again amended their pleadings in April 2022 (*see* NYSCEF 141, 146, 147).

Note of Issue was filed on August 5, 2022 (NYSCEF 149).  Both sides moved for summary judgment, which was denied (NYSCEF 312 and 313).  Seaport moved to strike Vore's demand for a jury trial (NYSCEF 325, Mot. Seq. 007), which was granted (NYSCEF 334).

A non-jury trial was held December 4, 2023, through December 12, 2023 (NYSCEF 351-358 [trial transcripts with stipulated errata]).

[* 14]

## CONCLUSIONS OF LAW

I. **Breach of the Compensation Agreement**
   **(Vore's Second Cause of Action, Seaport's First Counterclaim)**

   A. *The Compensation Agreement is an Executory Accord as to Vore's Claims Under the Offer Letter*

The first issue presented is whether the Compensation Agreement is an executory accord that conditionally discharged obligations under the Offer Letter or is instead a substitute agreement that entirely supplanted the Offer Letter. The Court finds that the Compensation Agreement was, at least in part, an executory accord.

"An executory accord, or 'accord and satisfaction,' is a contract that provides for discharge of prior existing obligations upon satisfaction of the newly bargained-for performance" (*Wyckoff v Searle Holdings Inc.* [Sup Ct, NY County 2013], *affd in part, mod in part*, 2013 NY Slip Op 07812 [1st Dept 2013]; GBL § 15-501 [providing that an executory accord is an agreement embodying a promise express or implied to accept at some future time a stipulated performance in satisfaction or discharge in whole or in part of any present claim]). "The distinctive feature of an accord and satisfaction is that the obligee does not intend to discharge the existing claim merely upon the making of the accord; what is bargained for is the performance" (*Albee Truck Inc. v Halpin Fire Equip. Inc.*, 206 AD2d 789, 791 [3d Dept 1994]). If the plaintiff can show that the executory accord was not performed according to its terms by defendant, the plaintiff can "pursue either the original claim or the accord" (*Plant City Steel Corp. v Natl. Mach. Exch., Inc.*, 23 NY2d 472, 478 [1969]; GBL § 15-501[3]).

"Such a contract is to be distinguished from a substitute agreement: 'Whereas an executory accord extinguishes a claimant's prior claims upon performance of the accord, a substitute agreement extinguishes a claimant's prior claims upon execution of the agreement'"

(*Wyckoff v Searle Holdings Inc.* [Sup Ct, NY County 2013], *affd in part, mod in part*, 2013 NY Slip Op 07812 [1st Dept 2013]). A substitute agreement is a new agreement that immediately discharges the previous obligations (*Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375, 379 [1993]).

"Whether the parties intended a particular arrangement to be an accord or a substituted agreement involves a determination which may be aided by certain presumptions" (*Albee Truck Inc.*, 206 AD2d at 790). "Generally, it is assumed that one does not surrender an existing obligation for a promise to perform in the future * * * 'It is generally more reasonable to suppose that he bound himself to surrender his old rights only when the new contract of accord was performed'" (*id.*, citing *Goldbard v Empire State Mut. Life Ins. Co.*, 5 AD2d 230, 234 [1st Dept 1958]).

Here, the text of the Compensation Agreement makes clear that it was intended mainly to be an executory accord rather than a substitute agreement. Section 5 of the Compensation Agreement, titled "Satisfaction and Discharge of Seaport's Obligations to Vore in Connection with the UrtheCast Transaction," provides that "*[u]pon the transfer of the UrtheCast Compensation Shares to Vore*" (a) "all obligations of Seaport to Vore related to the UrtheCast Transaction" "will be fully satisfied and discharged," and (b) Vore "releases and discharges" Seaport from "any and all claims or counterclaims that Vore ever had, now has, or may have, in any way arising under, or related to, the Offer Letter." (NYSCEF 158 § 5 [emphasis added]).

This language confirms that satisfaction and release of the Offer Letter is conditioned on "upon the transfer of the UrtheCast Compensation Shares to Vore." Thus, only if Seaport performs will it be released from claims under the Offer Letter.

That said, the Court finds that Vore's obligation to pay the Vore Expenses was not conditional. "In interpreting a contract under New York law, "words and phrases ... should be given their plain meaning," and the contract "should be construed so as to give full meaning and effect to all of its provisions. [A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" (*LaSalle Bank Nat. Ass'n v Nomura Asset Capital Corp.*, 424 F3d 195, 206 [2d Cir 2005]). Here, Vore undertook an obligation to reimburse Seaport for certain expenses that related to the Urthecast transaction.

In these circumstances, the Court believes that the appropriate way to give effect to the parties' intentions is to harmonize the provisions of the Compensation Agreement and the Offer Letter (which survives due to Seaport's failure to deliver the Urthecast Shares) and give both their intended effect. "Where several instruments constitute part of the same transaction, they must be interpreted together. In the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument" (*BWA Corp. v Alltrans Exp. U.S.A., Inc.*, 112 AD2d 850, 852 [1st Dept 1985]).

Here, while the Offer Letter and the Compensation Agreement were not executed at the same time, and thus cannot be considered a single instrument, the agreements collectively reflect to parties' intent with respect to Vore's compensation for the UrtheCast transaction. The Compensation Agreement expressly references the Offer Letter. Because Vore's claims under the Offer Letter would only be released if Seaport transferred the Shares to Vore, the parties clearly contemplated a world in which both the Offer Letter and the Compensation Agreement

would be in play. Thus, the Court finds this to be analogous to interdependent contracts and thus, finds it appropriate to read these agreements together (*Nau v Vulcan Rail & Constr. Co.*, 286 NY 188, 197 [1941] [although the three agreements were made on different dates, they all "related to the same subject-matter, ... [and] must be read together as one ... since they were to effectuate the same purpose and formed a part of the same transaction"]; *TVT Records v Is. Def Jam Music Group*, 412 F3d 82, 89 [2d Cir 2005] [noting that "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'"]; *see also Perlbinder v Bd. of Managers of 411 E. 53rd St. Condominium*, 65 AD3d 985, 988 [1st Dept 2009] [noting two interrelated agreements "were executed as part of the same transaction and cross-reference one another"]; *Fernandez v Cohen*, 110 AD3d 557, 558 [1st Dept 2013] [agreements "executed at the same time, by the same parties, and for the same purpose, and therefore are, in the eye of the law, one instrument"]).

### B. Breach of the Compensation Agreement by Seaport and Vore

Here, both parties failed to perform under the Compensation Agreement. Although each contends its performance (Vore to pay expenses, Seaport to transfer shares) was only required if and when the other performed, the Court finds those arguments to be unpersuasive. The Compensation Agreement does not create any such conditions to performance.

Section 1(a) of the Compensation Agreement provides that: "As compensation for his work on the UrtheCast Transaction, and in consideration of Vore's indefeasible payment in full" of the Vore Expenses, "Seaport shall transfer" the "UrtheCast Compensation Shares" to "Vore in accordance with the restrictive terms and conditions set forth herein to occur not before January 1, 2019" (JX128 §1(a)). Section 1(d), in turn, provides that "[a]s soon as practicable following

the final resolution (the "Stifel Resolution") of both (i) the Stifel/Seaport Matter and (ii) the Stifel Arbitration Claim, but in no event later than sixty (60) days following the Stifel Resolution, Vore shall remit the Vore Expenses to Seaport in immediately available funds. Shares may be sold by Vore and proceeds will be deposited with Seaport to cover these costs" (JX128 §1(d)).

Finally, Section 2, titled, "Transfer of the UrtheCast Compensation Shares" provides: "Upon execution of this Agreement, the Parties shall: (a) begin the transfer process in connection with the reregistration of the UrtheCast Compensation Shares into Vore's name; and (b) begin the good faith negotiation of a pledge agreement (the "Pledge Agreement") . . . For the avoidance of doubt, the execution of the Pledge Agreement shall be a condition precedent to the reregistration of the UrtheCast Compensation Shares into Vore's name" (JX128 §2).

As these provisions make clear, Vore was obligated to pay the Vore Expenses sixty days following the Stifel Resolution, and such obligation is not conditioned on the transfer of shares to Vore. Likewise, Seaport is obligated to transfer the shares to Vore, and such obligation is not conditioned on Vore first paying the Vore Expenses. While the Compensation Agreement clearly contemplates these things happening somewhat simultaneously, so that the shares "*may be sold by Vore*" to cover the Vore Expenses, this is simply a possibility not a requirement. The parties used the mandatory "shall" throughout these three sections, leading the Court to conclude that the use of the permissive "may" in Section 1(d) was intentional. Furthermore, as evidenced by Section 2, the parties also clearly delineated when they intended to create a condition precedent when they agreed that "the execution of the Pledge Agreement *shall be a condition precedent* to the reregistration of the UrtheCast Compensation Shares into Vore's name." Once

[* 19]

again, if the parties had intended to make one party's performance a condition precedent to the other's, they knew how to do so.

> 1. *Seaport Breached the Compensation Agreement by Failing to Transfer the Shares to Vore*

Seaport breached the Compensation Agreement by failing to transfer the shares to Vore. As noted, Seaport's argument that it did not have to transfer the shares until Vore paid the Vore Expenses is not supported by the plain language of the Compensation Agreement. Furthermore, if Seaport believed that Vore had to pay first, and Vore failed to by January 29, 2019, then there would have been no reason for Seaport to have entered into the Pledge Agreement with Vore on February 26, 2019, which gave Seaport the right to sell, at any price, sufficient Shares to cover the Vore Expenses. Indeed, as noted above, Seaport was continuing to pursue ways to transfer the shares to Vore – and to use that transfer to pay the Vore Expenses – for *months* after Vore's "failed" to pay the Vore Expenses by January 29, 2019.

Seaport's argument that that there was no timeline for transferring the shares is unavailing. "When a contract does not specify time of performance, the law implies a reasonable time" (*Savasta v 470 Newport Assoc.*, 82 NY2d 763, 765 [1993]). "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case. Included within a court's determination of reasonableness are the nature and object of the contract, the previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one, as well as the specific number of days provided for performance" (*Zev v Merman*, 73 NY2d 781, 783 [1988]).

Here, the Compensation Agreement was entered into before the Stifel claims were resolved. The Compensation Agreement provides that upon execution of the agreement, the parties would begin the transfer process and begin the good faith negotiation of the Pledge

Agreement. Because the Compensation Agreement indicates that Vore *may* use the shares to pay off the Stifel Expenses, the parties clearly believed that the transfer would take place sometime following the final resolution of the Stifel claims or within 60 days thereafter—though not before January 1, 2019. In fact, during Compensation Agreement negotiations, Kurylak wrote Mascone in response to Vore's request that he receive the Shares after January 1, 2019 that "it could work on our end if we transfer the shares to him on January 1 or close to that date." (JX116).

The belief that the parties' performance would occur around the same time is further bolstered by Silverman's email to Vore on January 4, 2019: "Please let us know if you wish to write a check to the firm for all or some of that amount and/or whether you prefer that we liquidated some UrtheCast stock to cover some/all." (JX136-001). He reiterated on January 7: "if you prefer not to write a check, the default becomes Seaport's liquidation of some stock on or about 1/29 to cover the obligation." (JX138-001). Thus, based on the evidence presented at trial, a reasonable time to transfer the shares would have been in first couple months of 2019, after entering into the Pledge Agreement in February 2019 but before terminating Vore's employment in April 2019.

But not only did Seaport fail to perform within a reasonable time, the trial record demonstrated that Seaport **could not** have performed. Seaport's argument that the only reason they did not transfer the shares to Vore was because Vore failed to pay the Vore Expenses is not credible.

Section 5 of the Securities Act of 1933 prohibits any "person" from the "use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell [a] security through the use or medium of any prospectus or otherwise" unless there is an effective registration statement with respect to that security (15 USCA §77e; PX007 [Report of

[* 21]

Branden T. Burningham, Esq. on behalf of Plaintiff]; NYSCEF 357 ["Burningham Tr"] at 724:12-20).

As the proposed transferor of the restricted securities, Seaport would bear the burden of demonstrating that an applicable exemption exists (*Ackerberg v Johnson*, 892 F2d 1328, 1335 [8th Cir 1989] ["[T]he burden of proving entitlement to an exemption is on the party claiming entitlement"]; *S.E.C. v Cavanagh*, 445 F3d 105, n 13 [2d Cir 2006]). The 33 Act §4(a) allows for certain exemptions (15 USCA §77d), and Seaport's expert, Gary Ross, identified three potential exemptions: Section 4(a)(7), Section "4(a)(1-1/2)", and Rule 144 (17 CFR 230.144). However, Ross conceded that Section 4(a)(7) was not available to facilitate the transfer when Seaport entered the Compensation Agreement because Seaport could not meet the underwriter requirement (NYSCEF 357-BurninghamTr-768:9-769:5; NYSCEF 358-RossTr-949:12-24). Section 4(a)(1-1/2) exemption was also unavailable because Vore did not intend to hold the Shares for "investment intent." (JX128-002-§1(d)).

As to Rule 144, it requires, among other things, a one year holding period before a transfer (NYSCEF 357-BurninghamTr-733:15-19; NYSCEF 358-RossTr-921:4-9; JX178). At the time Seaport entered the Compensation Agreement in November 2018, there is no indication that Seaport intended to rely on Rule 144 to transfer the shares to Vore. Relying on Rule 144 would mean that the earliest possible date Seaport could have transferred the shares to Vore was May 6, 2019—one year after UrtheCast issued the shares to Seaport on May 3, 2018. Not only is this inconsistent with Seaport's argument that it intended to transfer securities to Vore as soon as practicable after Vore paid the Vore Expenses, Seaport did not establish that it could satisfy Rule 144's holding period. As Vore's expert testified, the holding period is to help establish that the

shares have "come to rest" and that the seller is not an underwriter[1] (NYSCEF 357-BurninghamTr-747:12-18).  If parties contract to distribute shares during the holding period, then those shares arguably have not "come to rest" (NYSCEF 357-BurninghamTr-748:1-4; *see also* 17 CFR 230.144 ["The Rule 144 safe harbor is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the Act"]).

The record indicates that this is why Seaport sought to enter a new contract in May 2019—the "Separation and Release Agreement"—just after the Rule 144 one year holding requirement expired (JX181; NYSCEF 356-SilvermanTr-607:22-25) ("Q: So that was not a coincidence that we just looked at a date of May 5th of the date that the Rule 144 exception would expire and this May 6th agreement. A: I think that's right, it was not a coincidence.").

The documentary evidence demonstrates Seaport's unsuccessful year-long effort to transfer the Shares to Vore and/or sell Shares into the market to cover the Vore Expenses and pay Vore his bonus (JX140-150; JX153-154; JX156; JX158; JX162-164; JX166-167; JX169; JX171-178; JX180-181; JX188-189; JX194-207).  Seaport's argument that they would have sold the shares to cover the Vore Expenses if only Vore had agreed is not credible.  First, as noted, the Pledge Agreement gave Seaport the right to sell the shares to cover the Vore Expenses at a public or private sale, thus no further "permission" from Vore was required.  Second, the extensive record of emails with UrtheCast, its U.S. transfer agent, and outside counsel demonstrate that UrtheCast would not book (*i.e.*, not allow) transfer to Vore without an opinion letter, and that Seaport could not simply sell the Shares into the market with the restrictive

---

[1] Rule 144 is a safe harbor under Section 4(a)(1), which exempts transactions by other than an underwriter (NYSCEF 357-BurninghamTr-747:12-18).

legend on them. Thus, the record at trial demonstrated that none of identified exemptions were available to Seaport to transfer the Shares to Vore under the Compensation Agreement.

Because Seaport failed to transfer the Urthecast Shares to Vore, Vore did not release or discharge Seaport from its obligations under the Offer Letter, discussed *infra*.

2. *Vore Breached the Compensation Agreement by Failing to Pay the Vore Expenses*

Vore breached the Compensation Agreement by failing to pay the Vore Expenses on or before January 29, 2019. Although the conduct of the parties supports the notion that they envisioned Vore "paying" the Vore Expenses by liquidating the Urthecast shares (rather than writing a six-figure check to his employer), the Compensation Agreement does not mandate that sequence of events.

Further, Vore's argument that if Seaport's "Vore goes first" argument is accepted, then the Compensation Agreement could not have been lawfully performed and is void pursuant to NYLL §193, is unpersuasive. While Vore argues that section 193 prohibits employers from making "any charge against wages, or require an employee to make any payment by separate transaction" including "[r]epayments of loans, advances, and overpayments, that are not in accordance with Subpart 195-5 of this Part;" "[r]ecoupment of unauthorized expenses;" and "[r]epayment of employer losses" (NYLL §193(3)(a); 12 NYCRR 195-4.5), Vore ignores that §193(d) permits "repayment of advances of salary or wages made by the employer to the employee", as long as the employee has notice (NYLL §193(d)). In any event, the Court does not accept Seaport's "Vore goes first" argument. Rather, as noted, each party was unequivocally obligated to perform, and neither party was required "to go first." The Vore Expenses was compensation by Vore for saddling Seaport with liability to Stifel. The labor law does not prohibit an employer and employee from reaching an arm's length agreement to permit

repayment of expenses caused by the employee as part of a larger agreement to pay the employee millions of dollars in compensation.

For his breach, the Court finds Vore liable to Seaport in the amount of $616,401.68, plus prejudgment interest running from January 29, 2019.

## II. Breach of the Offer Letter
### (Vore's First Cause of Action)

As noted, because Seaport failed to transfer the Urthecast Shares to Vore pursuant to the Compensation Agreement, Vore has not released Seaport from his claims under the Offer Letter (JX005) as provided in Section 5 of the Compensation Agreement.

### A. *Vore "Sourced and Placed" the UrtheCast Transaction Prior to December 31, 2017*

The main issue as to Seaport's liability under the Offer Letter is whether or not Vore "sourced and placed" the UrtheCast transaction prior to December 31, 2017. The Offer Letter does not define these terms, does not state that Vore must "introduce" UrtheCast to the ultimate source of funds, and does not require that Vore act alone in completing the transaction. Although Seaport personnel exerted effort to complete the transaction, there is little doubt that Vore was the driving force in bringing the lucrative opportunity to Seaport at an advanced stage and remained an integral player in every step of the Transaction. The Offer Letter does not suggest that Vore would forfeit his compensation for the undeniably lucrative opportunity he brought to Seaport unless he completed the complex task without input from his colleagues at Seaport. Indeed, Seaport's actions throughout 2019 (before and after terminating Vore) demonstrate Seaport's intention to compensate Vore for his role in the Urthecast transaction, if only they could find a way to transfer the Urthecast shares (which it became clear it simply could not do). The bottom line is that by December 31, 2017, UrtheCast agreed to pay Seaport the

[* 25]

$5,000,000 advisory fee, which had been fully earned as of December 27, 2017, and UrtheCast announced that it was finalizing the closing documentation for the transaction.

Seaport's claim that its early January 2018 emails about whether to recognize the $5 million UrtheCast advisory fee as 2017 or 2018 revenue had nothing to do with Vore's compensation is not credible. No Seaport witness could explain why they circulated Vore's Offer Letter along with the UrtheCast Transaction documents. Based on the Court's review of the evidence, and evaluation of the credibility of the witnesses, the most plausible inference is that Seaport was acutely aware of Vore's Offer Letter and knew that he had in fact earned his 80 percent commission under the Offer Letter by the end of 2017.

Accordingly, the Court finds that Seaport breached the Offer Letter and is liable to Vore in the amount of $3,951,603 under the terms of that agreement. This amount is calculated as follows: 80 percent of Seaport's $6 million fee from Urthecast is $4,800,000, reduced to $4,000,000 (maximum under the Offer Letter), less the $48,397 base salary paid to Vore in 2017 (JX209).

### III. Labor Law Claim
### (Vore's Third Cause of Action)

Vore's Labor Law claims under Sections 191, 193, and 198 for unpaid wages, liquidated damages and attorney's fees are denied. The remedies under NYLL §198(1-a) "are available only to plaintiffs who prove a violation of article 6" of the NYLL (*Pachter v Bernard Hodes Group, Inc.*, 10 NY3d 609, 616 [2008]). Here, Vore did not prove a violation of Section 191(1)(c) or 191(3) because Vore did not prove he was a "commissioned salesperson" or "clerical or other worker" (Labor Law §190(6), (7)). NYLL defines a "commission salesperson" as "any employee whose principal activity is the selling of any goods, wares, [or] merchandise ... and whose earnings are based in whole or in part on commissions." (NYLL § 190(6)).

There is no evidence that Vore's "principal activity" was "selling" and cases hold financial services professionals exercising judgment and providing advice are neither (*Schuit v Tree Line Mgt. Corp.*, 46 AD3d 405, 406 [1st Dept 2007]; *Taylor v Blaylock & Partners, L.P.*, 240 AD2d 289, 292 [1st Dept 1997]; *Carlson v Katonah Capital, L.L.C.*, 10 Misc 3d 1076(A) [Sup Ct, NY County 2006]).

Vore also fails to prove a violation of Section 193. "[W]holesale withholding of commissions is not a specific deduction from wages as required under § 193" (*Raparthi v Clark*, 214 AD3d 613, 614 [1st Dept 2023]). *Raparthi* and other First Department decisions have denied Section 193 claims even after passage of the No Wage Theft Loophole Act, which went into effect after the events at issue in this litigation (*see Overton v Egami Grp.*, 201 AD3d 455, 455 [1st Dept 2022] ["Labor Law § 193 claim fails to allege an unlawful deduction from wages"]; *Vergara v Mission Cap. Advisors*, 200 AD3d 484, 485 [1st Dept 2021] [wholesale payment withholding fails to state claim]).

In any event, Vore chose to enter into the Compensation Agreement setting different compensation on different terms, with different benefits and risks, which was his right. He did this in November 2018 before he would have received any "annual payout" (normally in March 2019). "[N]either section 193 nor any other provision of article 6" precludes Vore from structuring a compensation formula based on an agreement with Seaport (*Pachter v Bernard Hodes Group, Inc.*, 10 NY3d 609, 617-18 [2008]). When sophisticated employees "voluntarily agree to forego certain compensation, they are 'held to the bargains made by them with their eyes open,' irrespective of the Labor Law prohibitions." (*Cantor Fitzgerald Assoc., L.P. v Mines*, 1 Misc 3d 906(A) [Sup Ct, NY County 2003]). Accordingly, Vore's Labor Law claims are denied.

[* 27]

## IV. Indemnification
### (Seaport's Second Counterclaim)

Seaport's Second Counterclaim for indemnification pursuant to the Compensation Agreement is denied. Section 6 of the Compensation Agreement provides: "Indemnification. Vore hereby agrees to indemnify, defend and holds Seaport and its successors, assigns, affiliates, directors, officers, partners, investors, representatives, attorneys, insurers, agents and employees harmless from any damage, loss, claim (including, without limitation, any claims brought by third parties or claims between the parties to this Agreement) or expense arising out of or in connection with any matters contemplated by this Agreement" (JX128).

The Court previously found that both Seaport and Vore breached the Compensation Agreement. Although Vore must fulfill his unequivocal obligation to pay Vore Expenses, Seaport has not established any basis for any additional relief in the form of "indemnification … arising out of or in connection with" the Compensation Agreement.

## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, it is

**ORDERED** and **ADJUDGED** that Seaport is liable to Vore under Vore's First Cause of Action for Breach of the Offer Letter in the about of $3,951,603, with prejudgment interest running from April 30, 2019 (the date of Vore's termination); it is further

**ORDERED AND ADJUDGED** that Vore's Second Cause of Action for Breach of the Compensation Agreement; Third Cause of Action for Violations of the Labor Law; and Fourth, Fifth, and Sixth Causes of Action for Quasi-Contract Relief [2] are **DISMISSED**; it is further

---

[2] Vore's quasi-contract claims were withdrawn.

**ORDERED** and **ADJUDGED** that Vore is liable to Seaport under Seaport's First Counterclaim for Breach of the Compensation Agreement in the amount $616,401.68, with prejudgment interest running from January 29, 2019; the remainder of the First Counterclaim and Seaport's Second Counterclaim for Indemnification is **DISMISSED**.

**ORDERED** that the parties submit a proposed judgment within ten (10) days of the date of this Order.

This constitutes the decision and order of the Court.

20240417165245MC0HEN659A7BEFA8E746B9AA06C0492DF007EE

**DAT 4/17/2024**

**JOEL M. COHEN, JSC**

**Check One:** **X** **Case Disposed** ☐ **Non-Final Disposition**

**Check if Appropriate:** ☐ **Other (Specify** _____ **)**